## UNITED STATES ex rel. FARM CREDIT ADMINISTRATION v. BURLEIGH.

### No. L—12634.

District Court, D. Oregon.
Dec. 21, 1938.

Carl C. Donaugh, U. S. Atty., and J. Mason Dillard, Asst. U. S. Atty., both of Portland, Or., for plaintiff.

Jay Bowerman, of Portland, Or., for defendant.

McCOLLOCH, District Judge.

This, I believe, is one of the few instances where the Government lent its aid to stock selling; and, as often happens with stock sales, the purchaser, who is the defendant, got nothing of substantial value for his money.

The transaction out of which the suit arises occurred in 1931. Defendant is an attorney and stockman living in Eastern Oregon. At the time stated he was a borrower from a certain livestock loan company, which had re-discounted his loan, along with other loans, in the usual way

with one of the Federal Intermediate Credit Banks. Inspired by the commendable purpose of aiding the livestock industry, which was then, like the rest of the country, in the throes of the depression beginning in 1929, Congress authorized the Secretary of Agriculture to loan money to aid the sale of capital stock in sound livestock loan companies. Public No. 666, approved February 14, 1931, 46 Stat. 1160.

Defendant, who is a leading lawyer and outstanding citizen of his community, testified that the executive officer of the livestock loan company represented and promised defendant and other livestock men who had loans with the company, that payment of neither principal nor interest of the notes given for stock was expected, and that the company would re-purchase the stock after two years. In short, that the arrangement, whereby the note and similar notes by other borrowers from the company were given, was a temporary accommodation to tide over the company's credit difficulties; and, needless to say, it was represented that the loan company was sound.

It has since been disclosed that the loan company's financial position was not sound at the time the stock was purchased, and that this was known to the Department of Agriculture which made the loan by the use of United States Treasury funds, and to the Intermediate Credit Bank, which got the benefit of the loan through the deposit of its proceeds as general collateral to all of the loan company's re-discounts.

Defendant has long since paid off the loan on his own cattle, but it has developed that other loans, which the loan company was carrying at the time, were not good, with the result that the loan company is in liquidation, and the Government now feels impelled to demand payment of defendant's note in order to meet shortages that have resulted from loans of other borrowers.

No criticism is here intended of the motives of the Government officials involved. They were merely carrying out the declared policy of Congress at the time. But an Act of Congress does not justify the taking of money out of one man's pocket and putting it into the pocket of another, unless the donor gets value.

### Borrower Did Not Receive Value.

In this case Mr. Burleigh got nothing of substantial value for his promissory note. The stock in the loan company which he was persuaded to take was of doubtful value then, and has little or no value now. The only lawful consideration which can be found for the note Mr. Burleigh was induced to give was the implied assurance that if he gave the new note, he would not be closed out of the cattle business. If a private money lender said to a borrower in distress, "I will close you out unless you give me an additional note", and gave nothing of value for the new note, could there be any doubt of the invalidity of the additional note?

■ The same rules of justice by which private transactions are tested should be applied to transactions to which the Government is a party. Mr. Justice Holmes so held in the case of United States v. National Exchange Bank, 270 U.S. 527, 46 S.Ct. 388, 70 L.Ed. 717.

■ Government counsel insist that misrepresentations by the loan company officials cannot be charged to the Government. The Department of Agriculture and the Intermediate Credit Bank knew that the loan company was financially unsound. They knew or should have realized that an investment in the stock of the loan company at that particular time was not a sound investment. They stood by and permitted the sale of stock which to their definite knowledge was then of doubtful value,—stock which has since turned out to have little or no value. The Department of Agriculture not only furnished the money to make the sale of the stock possible, more,—it took the greatest pains to see that the proceeds of Burleigh's note went to but one source and for one purpose,—to bolster up the loan company's position with the Credit Bank.

Bret Harte's "Heathen Chinee" could have taken a lesson from the intricacies of the transaction by which, under the guidance of the Department of Agriculture, the proceeds of the Burleigh note were kept from Burleigh's hands, also out of the possession of the loan company, and finally landed with the Intermediate Credit Bank as general collateral to the loan company's obligations.

### Rescission Possible and Will do Justice.

The Department of Agriculture and the Credit Bank took too active part in the transaction to disclaim responsibility now for the unpleasant aspects of the affair. If there is a desire to do justice in the hearts

940

of all concerned, let the Intermediate Credit Bank convert the Land Bank bonds, which it bought with the proceeds of the Burleigh note, into cash, return the cash to the United States Treasury whence it came, and let the Farm Credit Administration, which has succeeded to the position of the Secretary of Agriculture, return to Mr. Burleigh the stock which it holds as collateral to his note. Then Mr. Burleigh can return the stock to the loan company for cancellation. Thus, all parties will be returned to their original positions and an obvious injustice corrected. Fortunately, the rights of no innocent purchaser are involved.

If the procedure suggested be followed, a just Government can undo a transaction in which its over-zealous representatives took too active a part. A more direct method has been found in later years to lend financial assistance to the livestock industry and other branches of agriculture when required in the public interest. Happily, the device of requiring a borrower in financial straits to buy capital stock in the company carrying his loan, for the purpose of improving the position of the company with a Government chartered re-discount bank, has been discarded.