## UNITED STATES ex rel. FARM CREDIT ADMINISTRATION v. BURLEIGH.

No. 9220.

Circuit Court of Appeals, Ninth Circuit.

April 2, 1940.

Carl C. Donaugh, U. S. Atty., and J. Mason Dillard, Asst. U. S. Atty., both of Portland, Or., for appellant.

Burleigh & Burleigh and J. A. Burleigh, all of Enterprise, Or., and Jay Bowerman, of Portland, Or., for appellee.

Dana E. Brinck and J. Webster Hancox, both of Spokane, Wash., and Richard W. Young, of Berkeley, Cal., amici curiae.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The suit is on a promissory note executed by appellee Burleigh in favor of the Secretary of Agriculture. The trial court denied recovery. D.C., 26 F.Supp. 938.

By act of February 14, 1931 (Public No. 666, 71st Cong., 46 Stat. 1160, Congress appropriated $20,000,000 to be used by the Secretary of Agriculture "to make advances or loans to individuals in the drought and/or storm or hail stricken areas of the United States for the purpose of assisting in forming local agricultural-credit corporations, livestock loan companies, or like organizations, or of increasing the capital stock of such corporations, companies, or organizations qualified to do business with Federal intermediate credit banks, or to which such privileges may be extended * * *. The advances and loans made pursuant to this Act and amendment thereto shall be secured by liens on crops or by other security, under such rules and regulations as the Secretary of Agriculture may prescribe."

The rules of the Secretary, promulgated when the act became effective, provided that in cases of loans to individuals for the purpose of increasing the capital stock of an agricultural credit or livestock loan corporation the proceeds of the loan must be used to form part of the capital structure of the corporation, either by expanding it or to replace an impairment. An individual desiring a loan for this purpose was required to submit to the Secretary an application stating the amount and purpose for which the loan was desired, accompanied by a sworn statement of his financial condition and by a financial statement of the corporation in whose stock he proposed to invest. The regulations required that the stock certificates in the credit corporation or loan company be assigned in blank by the borrower and deposited with the Secretary as security for the loan. Additional collateral might be called for either at the time the loan was made or thereafter if the Secretary found the security was impaired.

In March, 1931, appellee applied to the Secretary for a loan of $1,000 on his personal note for the purpose of increasing the capital stock of the Agricultural & Livestock Credit Corporation of Portland, of which concern appellee was then a borrower. The application conformed to the requirements of the regulations and was accompanied by the necessary financial statements of the applicant and of the Corporation. The loan was granted and by way of security appellee assigned to the Secretary the certificate for the shares purchased with the proceeds. In conformity with a condition imposed by the Secretary, appellee in writing authorized one Altermatt, a member of the Oregon State Advisory Committee, to endorse and collect the Treasury check representing the loan proceeds, and to pay the same over to such person or persons as the Secretary might designate. The application and accompanying papers indicated that the proceeds were not to be disbursed to the borrower personally, but through the borrower's attorney-in-fact were to be applied directly to the purpose for which the loan had been requested.

The loan proceeds were placed by the attorney with the Federal Intermediate Credit Bank of Spokane to the account of the Corporation, and upon the direction of the latter were invested in Federal Land Bank bonds. The bonds so acquired constituted an investment pro tanto of the Corporation's capital. These securities continued to be held by the Spokane Bank as additional collateral for loans discounted with it by the

Corporation. [1] Presumably this was the normal procedure followed by the Secretary in making loans for the acquisition of stock in loan companies currently doing business with a federal intermediate credit bank. There is nothing in the record to the contrary.

Appellee's note was not paid, and on June 5, 1932, it was renewed for an additional year. The suit is on the renewal note. Briefly stated, appellee's answer alleged as defenses want of consideration and fraud in procurement. Upon issues so framed, and after the taking of evidence, the trial court made findings which appear to substantiate these defenses. Judgment was accordingly entered in appellee's favor.

The findings are lengthy and incorporate much evidentiary matter. Inter alia, it was found that there was no consideration for the original or the renewal note; that the stock of the Agricultural & Livestock Credit Corporation had slight if any value; and that appellee would not have signed the note except for his belief of representations made to him concerning the solvency of the Corporation and the worth of its stock. In the main the findings and opinion below reflect the view that the government conspired with the Credit Corporation to sell stock of the latter, apparently with the sole aim of improving the collateral position of the Federal Intermediate Credit Bank of Spokane in relation to existing loans discounted for the Corporation, some of which were thought to have become sour. [2]

There is evidence that appellee, in common with other borrowers of the Agricultural & Livestock Credit Corporation, was asked by an officer of the latter to subscribe for stock in order to increase the Corporation's capital. The vice-president of the Corporation wrote appellee to the effect that the Federal Intermediate Credit Bank is authorized to discount acceptable loans for livestock loan companies to ten times the amount of the capital of such companies, and that therefore loan companies could expand their loans to the extent of ten dollars for each dollar put into new stock. [3] The letter stated that money could be borrowed from the government by individuals, under regulations set up by the Secretary of Agriculture, for investment in the company's stock, and appellee was asked to cooperate by taking advantage of the government's offer. "After two years," the letter said, "if the government has made no provision for further extension for repayment of the advance on the stock, we will then redeem the stock at par." The sound financial condition of the Corporation was stressed.

No proof was offered to connect the Secretary with these representations, nor any tending to show that the official or his agents sought to induce any person to acquire stock. Nor, if the point is material, was the Spokane Bank shown to have had part in the movement or knowledge of improper inducements held out to appellee or to others in the course of it. The Credit

---

[1] By the rules of the Federal Farm Loan Board pertaining to federal intermediate credit banks, in force since 1925, the latter were authorized to require agricultural credit corporations set up to deal wholly or principally with the banks to pledge all or part of the capital of such corporations as additional collateral. See Act March 4, 1923, 42 Stat. 1454, 1459, 12 U.S.C.A. § 1101. The practice appears to have been continued by the Farm Credit Administration in connection with the discounting relations between the intermediate credit banks and Production Credit Associations later set up and in part capitalized by the government. Act of June 16, 1933, 48 Stat. 259, 12 U.S.C.A. § 1131d. This collateral operates as a cushion and naturally adds to the security behind the debentures of the banks which are sold to the public and which do not constitute obligations of the government. 12 U.S. C.A. §§ 1041–1043. Incidentally, the main source of the operating funds of the

banks is from the sale of these debentures.

[2] The court found that "at some time between the enactment in February, 1931, of Public Document 666 and the date of the note given by the defendant Burleigh, the plaintiff herein [the United States] acting by and through the then Secretary of Agriculture, and those representing him, and the plaintiff [the United States] acting by and through the Federal Intermediate Credit Bank of Spokane, entered into a plan and device with the Agricultural & Livestock Credit Corporation, having for its purpose the improvement of the financial condition of said Agricultural & Livestock Credit Corporation, and thereby improving the position of the Federal Intermediate Credit Bank of Spokane. As part of said plan it was proposed to offer to sell at par the Class A preferred stock of said Agricultural & Livestock Credit Corporation."

[3] See 12 U.S.C.A. § 1032.

Corporation was not the agent of the Secretary or for that matter of the Intermediate Credit Bank. The fraud of the Corporation, assuming it was guilty of any, has no perceivable bearing on the government's right to enforce payment of the note.

Appellee obtained from the Secretary the loan he voluntarily bargained for.[4] There was no lack of consideration for the note he gave in return. And as regards the worth of the stock acquired, his own application and accompanying exhibits represented the capital structure of the Corporation to be sound.[5] He has no rational ground to complain if the Secretary took him at his word. It does not appear that the Secretary was in possession of any information concerning the financial condition of the company other than that disclosed in the statement appellee himself submitted; and the record is devoid of evidence that the Secretary made any independent investigation of the Corporation's affairs or led appellee to believe he purposed doing so.

■■ The court's finding of the existence of a concerted plan or conspiracy between the Secretary and the Federal Intermediate Credit Bank of Spokane (see note 2) is predicated on the procedure followed by the Secretary in making the loans authorized, plus proof of the following circumstances: About the time appellee applied to the Secretary employees of the Bank conducted a periodic examination of the Corporation. On the basis of their report officers of the Bank wrote the Corporation criticizing certain of its loans and the non-liquid character or intrinsic worth of assets in which a substantial part of its capital was tied up.[6] There was an entire lack of evidence to connect these routine activities of the Bank with the unrelated function of the Secretary. The United States is not as a matter of law chargeable with knowledge obtained by a federal intermediate credit bank in the conduct of its business.

We will not stop to analyze the finding further than to say it is argumentative rather than factual, and is based on a hierarchy of inadmissible assumptions.

In this instance the Secretary appears to have done no more than faithfully to carry out the mandate of Congress. We need not dwell upon the aim of the legislation; the act speaks for itself. Congress did not guarantee results; and we may assume, although there is no adequate evidence of the fact, that in respect of this particular company the congressional loans failed of the effect hoped for. It is a matter of history that a myriad of hopes perished in the lengthening shadows of the great depression.

In 1932, in a further effort to relieve the industry, Congress authorized the setting up of the Regional Agricultural Credit Corporations,[7] to be supplanted a year later by the production credit system.[8] A common objective of these several acts was to make available to farm producers the reservoirs of credit afforded by the federal intermediate credit banks. (See note 1 above).

We have thought it best to dispose of the case on its facts, without considering the applicability of the general rule that "the United States are neither bound nor estopped by the acts of their officers and agents in entering into an agreement or arrangement to do or cause to be done what the law does not sanction or permit." Wilber Nat. Bank v. United States, 294 U. S. 120, 123, 55 S.Ct. 362, 364, 79 L.Ed. 798.

The judgment is reversed.

HANEY, Circuit Judge (concurring).

I concur in the result on the ground that if we assume, without so holding, that statements or declarations amounting to fraudulent representations or the initiation of a conspiracy to defraud, by an agent of the United States, I think such statements or representations are not binding on the United States or its instrumentalities. Wil-

---

[4] There is no suggestion that appellee is incompetent. He is said by the trial court to be a leading lawyer and an outstanding citizen of his community.

[5] While the financial statement of the Corporation submitted to the Secretary is not in the record, the statement of its condition currently put out showed its capital to be intact and that it had a substantial surplus.

[6] A regulation of the Farm Loan Board then in force, relating to investment of the capital of rediscounting agencies, excluded long-term real estate loans and other non-liquid assets from the definition of unimpaired capital.

[7] Act July 21, 1932, 47 Stat. 713, 12 U.S.C.A. § 1148.

[8] Act June 16, 1933, 48 Stat. 259, 12 U.S.C.A. § 1131d.

ber National Bank v. United States, 294 U. S. 120, 123, 55 S.Ct. 362, 79 L.Ed. 798.

I concur with Judge HEALY'S opinion in holding that want of consideration was not shown.